COMMUNITY HOSPITAL OF ROA-
NOKE VALLEY; Giles Memorial Hos-
pital; Johnston Memorial Hospital;
King's Daughters' Hospital; Lonesome
Pine Hospital; Martha Jefferson Hospi-
tal; Memorial Hospital; Roanoke Me-
morial Hospital; Smyth County Com-
munity Hospital; Twin County Com-
munity Hospital; Waynesboro Commu-
nity Hospital; and Wythe County Com-
munity Hospital, Appellees,

v.

HEALTH AND HUMAN
SERVICES, Appellant.

CULPEPER MEMORIAL HOSPITAL,
INC.; DePaul Hospital; Fairfax Hospi-
tal; Loudoun Memorial Hospital; Mary
Washington Hospital, Inc.; Medical
College of Virginia; Petersburg Gener-
al Hospital; Portsmouth General Hos-
pital; St. Mary's Hospital; Winchester
Memorial Hospital, Appellants,

v.

Margaret M. HECKLER, Secretary of
Health and Human Services, Appellee.

Nos. 84–1709(L), 84–2005.

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1985.

Decided August 26, 1985.

Sanford V. Teplitzky, Baltimore, Md. (James B. Wieland, Ober, Kaler, Grimes & Shriver, Baltimore, Md., John William Crews, Martin A. Donlan, Jr., Crews, Hancock & Dunn, Richmond, Va., on brief), for appellants.

Javier A. Arrastia, Asst. Regional Atty., Philadelphia, Pa. (Beverly Dennis, III, Regional Atty., Dept. of Health and Human Services, Philadelphia, Pa., John P. Alderman, U.S. Atty., Roanoke, Va., Karen B. Peters, Asst. U.S. Atty., Elsie L. Munsell, U.S. Atty., Alexandria, Va., G. Wingate Grant, Asst. U.S. Atty., Richmond, Va., on brief), for appellees.

Before RUSSELL, HALL and ERVIN, Circuit Judges.

ERVIN, Circuit Judge.

This appeal concerns the validity of Medicare accounting practices governing hospital labor/delivery room services. The plaintiff hospitals seek reimbursement from the Department of Health and Human Services for services provided to Medicare beneficiaries, and challenge the agency's reimbursement practices. In filing their requests for reimbursement with the agency, some of the hospitals complied with the Secretary's labor/delivery room accounting methods and others did not. The complying and noncomplying hospitals then challenged the reimbursement practices without success in the administrative appeals process. Subsequently, the hospitals filed suit in federal court.

Upon cross motions for summary judgment, the United States District Courts for the Eastern and Western Districts of Virginia rendered contrary rulings. In *Community Hospital of Roanoke Valley v. Heckler*, 588 F.Supp. 674 (W.D.Va. (1984)), the court ruled, first, that it had jurisdiction to consider appeals by the hospitals that had complied with the challenged practices, and second, that the accounting methods were improper. In *Culpeper Memorial Hospital v. Heckler*, 592 F.Supp. 1173 (E.D.Va.1984), the court declined to consider the jurisdictional question, and found the accounting policy to be a permissible exercise of agency discretion. The Secretary now appeals from the decision in *Community Hospital*, and the hospitals appeal from the ruling in *Culpeper*. We reverse the jurisdictional ruling in *Community Hospital* and affirm that case on the merits. We reverse the judgment in *Culpeper*.

I.

The plaintiffs in these consolidated cases are acute care general hospitals certified as

Medicare providers. *See* 42 U.S.C. § 1395x(u). The hospitals provide services to Medicare beneficiaries and are entitled to reimbursement for the "reasonable cost" of the services. *See* 42 U.S.C. § 1395x(v). The hospitals claim that the method of computing patient costs during the billing period at issue in this case [1] improperly diluted the actual cost of Medicare patient services. As a result, they argue that Medicare costs have been shifted to non-Medicare patients in violation of 42 U.S.C. § 1395x(v)(1)(A).

For the purpose of Medicare reimbursement, hospital services are divided into three areas: 1) routine services in general care areas such as normal hospital beds, nursing services and meals, 45 C.F.R. § 405.452(d)(2), 2) routine services in special care areas such as intensive care and coronary care units; and 3) ancillary services such as x-rays and lab analysis for which separate charges are customarily made. 42 C.F.R. § 405.452(d)(3). Medicare reimbursement is determined separately for each of these three areas. Reimbursement for routine services in general care areas is determined by multiplying the average cost per patient per day of routine care by the number of Medicare patients receiving routine services. The disputed question in this case is whether the method of calculating average routine costs is rational and is consistent with the Medicare statute.

The average cost per day of providing routine services is calculated by dividing the overall cost of the services by the number of Medicare and non-Medicare patients using the services. The average cost per day, or the "per diem," is then multiplied by the number of days of care rendered to Medicare beneficiaries. The resulting figure is the amount of reimbursement a hospital is entitled to receive. 42 C.F.R. § 405.452(d)(2). This process is illustrated as follows:

$$\frac{\text{Total Cost of Routine Services}}{\text{Total Number of "Inpatient Days"}} = \text{Average Cost "Per Diem"}$$

$$\text{Average Cost "Per Diem"} \times \text{Number of Medicare "Inpatient Days"} = \text{Amount of Reimbursement}$$

The total number of "inpatient days" is determined by counting the number of inpatients present in the hospital each day at the "midnight census hour." Each patient present at midnight is counted as representing one full day of routine care costs. Patients who have incurred routine costs during the day in question but have been discharged before midnight are not counted. Patients present at midnight who have been admitted shortly before the census hour and have only received a partial day's care are counted as having incurred a full day of routine costs. By counting only one of two partial days, the ultimate patient count approximates the number of 24–hour patient days actually spent in the hospital.

The issue disputed in this case is the propriety of including patients in the labor/delivery room in the overall patient count at the midnight census hour. In 1976, the Secretary adopted a policy requiring patients in the labor/delivery room at the census hour to be included in the routine care inpatient count. Provider Reimbursement Manual (hereinafter "PRM"), Part I § 2345 (September 1, 1976). While hospitals were required to include labor/delivery room patients in the number of inpatients receiving routine care, the costs of labor/delivery room services were not included in overall routine costs. This is due to the fact that labor/delivery room services are ancillary, not routine, services. *Id.* at § 2202.8. The requirement that labor/delivery room patients be included in the inpatient count reduces the average per diem cost of routine services. Because few Medicare patients use labor/delivery room services, it also reduces the compensation

---

**1.** The accounting practices challenged in this case were adopted in 1976 and were in force until October 1, 1983. *Compare* Provider Reimbursement Manual, Part I § 2345 (Sept. 1, 1976) (adopting challenged policy) *with* Pub.L. No. 98–21, §§ 601–607, 97 Stat. 149–172 (1983) (Social Security Amendments of 1983) (changing Medicare reimbursement methodology).

the hospitals receive for routine services. This result can be illustrated as follows using hypothetical figures:

A. Prior to Adoption of Labor/Delivery Room Policy

$$\frac{\text{Total Cost of Routine Services: } \$100,000}{\text{Total Number of Inpatient Days: 100}} = \text{Average Cost Per Diem: } \$1000$$

$$\text{Average Cost Per Diem: } \$1000 \times \text{50 Medicare Patient Days} = \$50,000 \text{ Reimbursement}$$

B. After Adoption of Labor/Delivery Room Policy

$$\frac{\text{Total Cost of Routine Services: } \$100,000}{\text{Total Number of Inpatient Days (including 100 Labor/Delivery Room Days): 200}} = \text{Average Cost Per Diem: } \$500$$

$$\text{Average Cost Per Diem: } \$500 \times \text{50 Medicare Patient Days} = \$25,000 \text{ Reimbursement}$$

---

Because they believed the labor/delivery room policy improperly reduced their Medicare reimbursement, several of the hospitals did not follow the requirement in calculating their routine costs for the applicable reimbursement period. Their accounting of routine service costs was rejected by the fiscal intermediary. The remaining hospitals complied with the policy, and joined the noncomplying hospitals in an appeal to the Provider Reimbursement Review Board ("PRRB"). The PRRB determined that it did not have jurisdiction to consider challenges to the policy by the hospitals that had complied with it. On the merits, the PRRB sustained the position of the noncomplying hospitals. It found that "obstetrical patients in the labor/delivery room ancillary service cost center at the inpatient census-taking hour have not received routine services." (JA 11). Consequently, the PRRB ruled that it was improper to include these patients in the inpatient count used for apportioning routine care costs.

The Deputy Administrator of the Health Care Financing Administration ("HCFA")[2] affirmed the PRRB's jurisdictional ruling and reversed the PRRB's substantive ruling. The Deputy Administrator believed that the labor/delivery room policy was proper because although a "labor/delivery room patient may not receive full routine services until she actually leaves the delivery room," these services "are always available to her in the hospital." (JA 26). In addition, "significant standby costs" are incurred in reserving routine beds for maternity patients in the labor/delivery area. Further, patients in other ancillary areas at the census hour, such as operating rooms and radiology departments, are properly included in the inpatient count. Consequently, the Deputy Administrator concluded that the policy was reasonable and was consistent with the Medicare regulations.

2. The Secretary has authority to affirm, reverse or modify decisions of the PRRB. 42 U.S.C. § 1395oo(f)(1). The Secretary delegated that authority to the Administrator of HCFA, who redelegated it to the Deputy Administrator.

Both complying and noncomplying hospitals then sought judicial review of the Deputy Administrator's decision. They filed group appeals under 42 U.S.C. § 1395oo (b) in the Eastern and Western Districts of Virginia, depending on the location of each particular hospital. The hospitals argued that the labor/delivery room policy was arbitrary and capricious, was an abuse of the agency's discretion, and was at odds with the requirement that Medicare reimburse costs actually incurred, 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 405.402(b)(3), and the prohibition against subsidization of Medicare costs by non-Medicare patients. 42 U.S.C. § 1395x(v)(1)(A)(i); 42 C.F.R. § 405.402(a).

Cross motions for summary judgment were filed in both cases, and the district courts entered contrary judgments. In *Community Hospital,* the court ruled that jurisdiction could properly be asserted over both complying and noncomplying hospitals. On the merits, following *St. Mary of Nazareth Hospital Center v. Schweiker,* 718 F.2d 459 (D.C.Cir.1983) (hereinafter *"St. Mary of Nazareth I"*), the court found that the labor/delivery room policy was "unreasonable, irrational and inconsistent with the Medicare statute and regulations." The court remanded the case to the Secretary for further consideration. 588 F.Supp. at 677–79.

In *Culpeper,* the district court affirmed the Deputy Administrator on the merits. The court declined to follow *St. Mary of Nazareth I,* which invalidated the labor/delivery room policy, on the basis that the District of Columbia Circuit had erred in the degree of deference it accorded the agency. Because of its view of the merits, the court found it unnecessary to reach the jurisdictional question.

The Secretary now appeals from the decision in *Community Hospital.* She argues that the district court's jurisdictional ruling is in conflict with the Medicare statute and that the labor/delivery room policy is a proper exercise of agency discretion. The hospitals appeal from the district court's ruling in *Culpeper,* arguing that the labor/delivery room policy is arbitrary and capricious and is inconsistent with the Medicare statute and regulations.

## II.

■ This court's jurisdiction to consider disputes regarding Medicare reimbursement is limited by the Medicare statute and its requirement of administrative exhaustion. 42 U.S.C. §§ 405(h), 1395ii. *See Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 2021–22, 80 L.Ed.2d 622 (1984); *Weinberger v. Salfi,* 422 U.S. 749, 757–58, 95 S.Ct. 2457, 2462–63, 45 L.Ed.2d 522 (1975). Under the statute, a provider of Medicare services may seek review of its reimbursement as follows. First, the provider submits an annual cost report to its "fiscal intermediary," the organization charged with evaluating the propriety of the requested reimbursement. *See* 42 U.S.C. § 1395h. Then a provider of services "may obtain a hearing with respect to such cost report" by a PRRB if the provider

> is dissatisfied with a final determination of the organization serving as its fiscal intermediary ... as to the amount of total program reimbursement due the provider for the items and services furnished to individuals for which payment may be made under this subchapter for the period covered by such report.[3]

42 U.S.C. § 1395oo(a)(1)(A)(i). The PRRB has

> the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination.

3. For an appeal by a single provider, the amount in controversy must be $10,000 or more. 42 U.S.C. § 1395oo(a)(2). Groups of providers may appeal common questions if their aggregate amount in controversy is at least $50,000. 42 U.S.C. § 1395oo(b).

42 U.S.C. § 1395oo(d). A provider may seek review of a PRRB decision by the Secretary, and may seek judicial review of the Secretary's final decision. 42 U.S.C. § 1395oo(f).

In a careful analysis of the scope of PRRB jurisdiction, the District of Columbia Circuit reasoned that § 1395oo(d)

> can best be thought of as embodying two separate jurisdictional grants. First, the PRRB has "the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report." 42 U.S.C. § 1395oo(d) (1982). Second, the PRRB has the power "to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination." *Id.* Jurisdiction exists if the terms of either of these two clauses are satisfied.

*Athens Community Hospital, Inc. v. Schweiker,* 743 F.2d 1, 4 (D.C.Cir.1984) (opinion on rehearing). As that court noted, the scope of jurisdiction conferred by § 1395oo(d) can be interpreted in a variety of ways. *Id.* at 4–5. In *St. Mary of Nazareth Hospital Center v. Department of Health and Human Services,* 698 F.2d 1337, 1346 (7th Cir.), *cert. denied sub nom., St. James Hospital v. Heckler,* —— U.S. ——, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983), the Seventh Circuit concluded that the statute allows the PRRB to consider matters not disclosed to the intermediary through the cost report. In rejecting the Seventh Circuit's approach, the District of Columbia Circuit concluded that such a broad reading of the scope of PRRB jurisdiction under 1395oo(d) would effectively nullify the language in the statute that limits the PRRB's authority to affirm, reverse or modify reimbursements to "matters covered by [a] cost report." *Athens Community Hospital,* 743 F.2d at 6. Further,

> the PRRB's jurisdiction, as defined by section 1395oo(d), must be read in light of the Board's functions as set out by section 1395oo(a). That section states that a provider "may obtain a hearing with respect to [a required] cost report" if a provider "is dissatisfied with a final determination of the ... fiscal intermediary." 42 U.S.C. § 1395oo(a) (1982). The subject of the hearing is plainly the cost report and the cost report is the subject of the "final determination." It would be anomalous, moreover, to say that a provider can appeal only when "dissatisfied" while allowing the provider to obtain review of an intermediary's refusal to reimburse the provider for a cost it did not even claim. We do not think Congress intended to permit a provider to claim dissatisfaction based upon its own failure to request reimbursement of a cost item.... It simply is not plausible to contend that Congress has created a scheme where the provider can claim dissatisfaction and have recourse to an appeal procedure because the intermediary failed to read the provider's mind and anticipate all those things the provider would like to be reimbursed for, even though it did not request them.

*Id.* (footnote omitted); *accord, Saline Community Hospital v. Secretary of Health and Human Services,* 744 F.2d 517, 520 (6th Cir.1984) (PRRB had no jurisdiction over claims not included in cost report).

We agree with the District of Columbia Circuit that the scope of jurisdiction conferred by § 1395oo(d) is limited to matters "put into dispute by the provider at the time the cost report is filed." *Athens Community Hospital,* 743 F.2d at 10. This reading of the statute is more consistent with the language of § 1395oo(d) and with the overall administrative appeals process contemplated by the Medicare statute than the Seventh Circuit's approach. *See* 42 U.S.C. § 1395oo. Accordingly, we hold that a provider must affirmatively place an issue in controversy at the time it files its cost report in order to preserve its ability

to appeal the matter to the PRRB.[4] Because the complying hospitals in this case did not in any way notify the fiscal intermediary that they intended to challenge the validity of the labor/delivery room policy, the PRRB correctly determined that it did not have jurisdiction to consider their appeal. The district court's ruling to the contrary in *Community Hospital* is therefore reversed.

## III.

■ The substantive issue in this case was first addressed by the District of Columbia Circuit in *St. Mary of Nazareth I.* In that case the Secretary pressed arguments identical to those offered in the case at bar. In a thorough and well reasoned opinion, Judge McGowan wrote for that court that the Secretary is not entitled to absolute deference on the question of the validity of the labor/delivery room policy because the policy has been inconsistent and because special agency expertise was not utilized in developing the present policy. 718 F.2d at 463–66. Further, even in keeping with the high degree of deference due an agency's interpretation of its own regulations, the Secretary's position is irrational. *Id.* at 466–474. The court reasoned that

> [i]t is irrational to apportion to labor/maternity patients costs which they have not incurred without either including the costs that they have incurred or demonstrating that the distortion is balanced by some other aspect of the accounting process. Because labor/delivery area costs are not included in the calculation of the average routine cost per diem and because there is no evidence that this imbalance is made up elsewhere, non-Medi-

care payors are forced to bear some of the costs of the Medicare program. This is a concrete violation of the constraints placed on the Secretary's discretion in promulgating regulations under 42 U.S.C. § 1395x(v)(1)(A).

*Id.* at 474.

The Courts of Appeals that subsequently have considered this issue have adopted the reasoning of *St. Mary of Nazareth I.* See *Beth Isreal Hospital v. Heckler,* 734 F.2d 90, 91 (1st Cir.1984); *Baylor University Medical Center v. Heckler,* 730 F.2d 391, 392 (5th Cir.1984); *International Philanthropic Hospital Foundation v. Heckler,* 724 F.2d 1368, 1369 (9th Cir.1984); *see also University of Tennessee v. U.S. Department of Health and Human Services,* 737 F.2d 579, 580 (6th Cir.1984) (remanding to the Secretary for reconsideration in light of *St. Mary of Nazareth I*). We follow suit.

As developed more fully in *St. Mary of Nazareth I,* the Secretary's labor/delivery room policy dilutes a hospital's reimbursable routine costs by counting labor/delivery room patients as routine patients when they receive no routine services. It thereby improperly shifts Medicare costs to non-Medicare patients. Labor/delivery services are ancillary services, so that the costs of those services are counted, for reimbursement purposes, separately from routine costs. The per diem cost of routine services should therefore be calculated by dividing total routine costs by the number of persons who actually use routine services. A certain percentage of women (10%–40%) who use labor/delivery services will not use routine services at all because they will be discharged due to false labor or other factors without ever occupying a routine bed.[5] Of the majority of maternity pa-

---

**4.** In this case, the noncomplying hospitals placed the validity of the labor/delivery room policy in dispute at the time they filed their cost reports by failing to comply with the accounting procedure. This need not be the only manner by which a provider can place an issue in dispute when filing a cost report. For example, a provider may append a letter to its cost report stating that it disagrees with a particular regulation and believes it is entitled to reimbursement for particular items not included in the body of

the cost report. *See Athens Community Hospital,* 743 F.2d at 5. The complying hospitals in this case did nothing at all to notify their fiscal intermediaries that they disagreed with the labor/delivery room policy.

**5.** The Secretary argues that maternity patients in the labor/delivery area do in fact incur routine "standby" costs because routine beds are reserved for them while they are in the labor/delivery area. However, for the purposes

tients who do use routine services, many will not use routine services on the day they are admitted. If a woman is admitted to the labor/delivery area at 11 P.M., for example, and after giving birth is transferred to a routine bed at 10 A.M. the following day, she has incurred no routine costs by the time of the midnight census hour. The appropriate day to begin counting her routine costs is the day she is transferred to a routine bed not the day she enters the labor/delivery room. Women will be transferred to routine beds at all hours of the day, so that for some the first routine day may consist of twenty hours while for others it may consist of two. The averaging that is appropriate in this context is averaging the partial transfer day with the partial discharge day. In the long run, counting only the transfer day and not the discharge day will even out. What is not reasonable is averaging the admission day, which for many involves no routine services, with the discharge day. Cost averaging is a reasonable method of accounting costs, but it must be accomplished in a rational manner.

For these reasons and other factors developed in greater detail in *St. Mary of Nazareth I*, we hold that, on the record before us, the Secretary's labor/delivery room accounting practices are irrational and contrary to Medicare law and regulations. Accordingly, the district court's ruling on the merits in *Community Hospital* is affirmed; the district court's ruling in *Culpeper* is reversed.

of Medicare reimbursement, such "standby" costs are not charged to the patient for whom a routine bed is reserved. Rather, they are included as part of the overhead in calculating overall routine costs and are apportioned among all patients actually receiving routine services. *St. Mary of Nazareth I*, 718 F.2d at 470.

6. The court later stated that it remanded the case in the manner it did

because HHS made this argument in its brief in *St. Mary's I*, but was denied the opportunity to present evidence to support it before the PRRB owing to the fact that the intermediaries, rather than HHS itself, opposed the hospitals before the PRRB.

## IV.

■ The Secretary argues that if this court should conclude upon the evidence presently in the record that the labor/delivery room policy is irrational, we should remand these cases to the Secretary. In *St. Mary of Nazareth I*, the court recognized that its ruling "could have a substantial impact on the Medicare program" and that the Secretary had not had an opportunity to present evidence before the PRRB. Consequently, the court remanded the case to the district court with instructions to remand to the PRRB

for the limited purpose of the PRRB's taking evidence on the question whether the number of Medicare patients found nationally in other ancillary areas at the census hour is sufficient to offset the dilution of Medicare reimbursement created by counting labor/maternity patients in the routine inpatient count. If there is no such offset or if the Secretary decides not to contest the issue, then the Secretary may not count labor/delivery patients, who have not previously that day received routine care, among the routine inpatient population for purposes of calculating the average cost per diem for routine services.[6]

718 F.2d at 474. Following *St. Mary of Nazareth I*, other Courts of Appeal have also remanded such cases. *See Beth Israel Hospital*, 734 F.2d at 92; *International Philanthropic Hospital Foundation*, 724 F.2d at 1369; *see also University of Tennessee*, 737 F.2d at 580.[7]

*St. Mary of Nazareth Hospital Center v. Heckler,* 760 F.2d 1311, 1318 (D.C.Cir.1985).

7. The Courts of Appeal adopting the *St. Mary of Nazareth I* remand order have differed somewhat on the appropriate scope of remand. In *Mount Zion Hosp. and Medical Center v. Heckler,* 758 F.2d 1346, 1347–48 (9th Cir.1985), the Ninth Circuit found that consideration of routine care costs, as opposed to ancillary costs, was outside the scope of the remand. *See infra* n. 8. In *Beth Israel Hosp.,* the First Circuit expressly adopted the *St. Mary of Nazareth I* remand order, yet also stated that the Secretary should be permitted to present evidence regarding routine costs. 734 F.2d at 92.

*St. Mary of Nazareth I* was never, in fact, remanded to the PRRB. On remand in the district court, the agency "stated repeatedly ... that it [could] produce no evidence on the *ancillary* service utilization discussed in the remand instructions." *St. Mary of Nazareth Hospital Center v. Heckler,* 760 F.2d 1311, 1313 (D.C.Cir.1985) (hereinafter *"St. Mary of Nazareth II"*) (emphasis in original). Rather, the agency wanted to present evidence regarding alleged higher routine costs generated by maternity patients. Because the agency did not intend to present evidence within the specific scope of the remand order, the district court determined that a remand to the PRRB was unnecessary. Instead, the district court ordered the Secretary to stop including labor/delivery patients who have not received routine services in the routine patient count. *Id.* The Court of Appeals affirmed. The court found that the attempt to present evidence on routine costs generated by maternity patients was a "prohibitively new tack for HHS" because "[t]he agency did not raise this point in *St. Mary's I* or in its petition for rehearing." *Id.* at 1319. According to the court, "this case, from its inception, has never presented the court with an opportunity to review the panoramic equity of the Medicare reimbursement scheme." *Id.* at 1318. To allow the Secretary to present evidence beyond the scope of the remand order

> would be for the court to fail to hold HHS to the deferential but meaningful standards of judicial review of its decisions. The definitions that HHS uses to

run the reimbursement scheme must bear some relation to reality. HHS could not attribute to labor/delivery patients all of a hospital's costs incurred in building a new wing for elderly patients and then claim that attribution was rational because the overall amount contributed by non-Medicare patients to all reimbursements was roughly equal to their share of overall costs.

*Id.*[8]

In *St. Mary of Nazareth II,* the court properly restricted its remand order to allow the Secretary to present evidence she had indicated to the court she wanted to present. In this case, the Secretary's proffer has been different. The Secretary claims that "data indicate that maternity routine patients consume more hours of more expensive care than all other routine patients. Without an adjustment to compensate for these costs, the reimbursement calculation would be skewed in favor of non-Medicare payors." Brief of Appellee at 36. The Secretary essentially argues that maternity patients generate greater routine costs than other patients once they actually begin to incur such costs. Therefore unless the Secretary can add labor/delivery room patients into the routine service calculus, the average cost per diem is higher than the actual cost incurred by Medicare patients, and the resulting Medicare reimbursement is too great. This argument can be illustrated as follows, using hypothetical figures.

---

The remaining cases did not resolve the question of the appropriate scope of remand. In *Baylor Univ. Medical Center,* the Fifth Circuit affirmed a district court decision allowing a hospital to exclude labor/delivery room patients from the routine patient count without requiring a remand. 730 F.2d at 392. Finally, in *Univ. of Tennessee,* the Sixth Circuit remanded the case to the Secretary for reconsideration without resolving the substantive issue of the propriety of the labor/delivery room policy.

**8.** Similarly, in the remand from *International Philanthropic Hosp. Found.,* the Secretary did

not "offer evidence within the narrow scope of the remand. Rather, she sought to recalculate the cost of providing services to maternity patients who leave the labor and delivery rooms and receive routine care." *Mount Zion Hosp. and Medical Center,* 758 F.2d at 1347-48. The district courts ruled that, due to the scope of the remand order, they were bound to require the Secretary to exclude labor/delivery room patients from the routine inpatient count. The Ninth Circuit affirmed. *Id.*

Non-Maternity Per Diem

$$\frac{\text{Total cost of non-maternity routine services: \$100,000}}{\text{Total number of non-maternity routine patients: 100 (including 50 Medicare patients)}} = \text{Per Diem for non-maternity routine patients: \$1000}$$

Maternity Per Diem

$$\frac{\text{Total cost of maternity routine services: \$200,000}}{\text{Total number of maternity patients receiving routine services: 100}} = \text{Per Diem for maternity routine patients: \$2000}$$

Overall Per Diem for Routine Services

$$\frac{\text{Total cost of all routine services: \$300,000}}{\text{Total number of all patients using routine services: 200}} = \text{Overall Per Diem for routine patients: \$1500}$$

| Overall Per Diem: $1500 | $\times$ 50 Medicare Patients | = | Medicare Reimbursement: $75,000 |
|---|---|---|---|
| Non-Maternity Per Diem $1000 | $\times$ 50 Medicare Patients | = | Actual Medical Costs: $50,000 |

As illustrated, under the Secretary's theory, the ratio of costs of routine services to the number of routine patients is skewed. The Secretary claims that the numerator is too large because maternity routine services are disproportionately higher than other routine services. She therefore argues that the denominator must be increased by addressing maternity patients in the labor/delivery area who have not yet received routine services. To continue with our hypothetical illustration, the Secretary would alter the calculus as follows:

$$\frac{\text{Total Cost of Routine Services: \$300,000}}{\begin{array}{l}\text{Total Number of Routine Patients: 200} + \begin{array}{l}\text{100 Labor/Delivery Patients}\end{array} = \begin{array}{l}\text{300 Patients}\end{array}\end{array}} = \text{Per Diem \$1000}$$

| Per Diem: $1000 | $\times$ 50 Medicare Patients | = | Medicare Reimbursement $50,000 |
|---|---|---|---|
| Non-Maternity Per Diem: $1000 | $\times$ 50 Medicare Patients | = | Actual Medical Costs $50,000 |

The Secretary has not had the opportunity to present evidence in these cases regarding the alleged greater cost of maternity routine services. We therefore remand these cases for the specific purpose of allowing the Secretary to present this

evidence, and to demonstrate that inclusion of labor/delivery patients in the routine patient count is therefore necessary to off-set what would otherwise be overcompensation to Medicare providers. The scope of our remand is limited to this point. *Cf. St. Mary of Nazareth II*, 760 F.2d at 1317–19; *Mount Zion Hospital and Medical Center*, 758 F.2d at 1347–48. If the Secretary is not able to show that maternity routine costs are, in fact, greater and that the labor/delivery room policy is a rational means of offsetting resulting overcompensation to providers, then the district courts should find that the labor/delivery room policy is invalid.

Accordingly, the judgment in *Community Hospital* is

AFFIRMED IN PART AND RE-VERSED IN PART.

The judgment in *Culpeper* is RE-VERSED.

Both cases are REMANDED WITH IN-STRUCTIONS.