GEORGETOWN UNIVERSITY
HOSPITAL, et al.

v.

Otis R. BOWEN, Secretary of Health
and Human Services.

Nos. 88–5026, 88–5040.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 17, 1988.

Decided Nov. 15, 1988.

Alfred Mollin, Attorney, Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Anthony J. Steinmeyer, Attorney, Dept. of Justice, and Gerard Keating, Attorney, Health and Human Services, Washington, D.C., were on the brief, for appellant.

Ronald N. Sutter, Washington, D.C., for appellees.

Before WALD, Chief Judge, and MIKVA and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

Concurring opinion filed by Circuit Judge MIKVA.

WALD, Chief Judge:

Appellees are twelve not-for-profit hospitals that successfully challenged the application of various regulations under the Medicare reimbursement scheme. The Secretary of the Department of Health and Human Services ("Secretary") agreed to make retrospective payments for years prior to 1983, the year in which Congress enacted a four-year transition to the Prospective Payment System ("PPS"), and he agreed to make prospective adjustments for years beginning after the final judgments were entered in the various challenges. The Secretary refused, however,

to make retrospective adjustments to payments that had been made to these hospitals during years of the phase-in period that had already passed by the time the successful challenges had been completed. The district court found that the Medicare statute required such retrospective payments, and ordered the Secretary to recompute the hospitals' reimbursement rates for the relevant years on the basis of the subsequent corrections. Because we conclude that the statute clearly reflects Congress' intent to provide such retrospective adjustments, we affirm the district court's judgment.

## I. BACKGROUND

Until 1983, hospitals participating in the Medicare program were reimbursed for the "reasonable cost" incurred in providing in-patient hospital services to Medicare patients. 42 U.S.C. § 1395f(b) (1982). In April 1983, however, Congress enacted a radically new Medicare reimbursement scheme. Rather than reimbursing hospitals for the actual costs of providing services to individual patients, the new payment system establishes prospectively fixed rates that do not vary according to cost in individual cases. Hospitals caring for Medicare patients who fall into a given "diagnosis-related group" ("DRG") receive a standard reimbursement for that patient. In contrast to the old system, under which hospitals had few incentives to control costs, the new system was designed to "reform the financial incentives hospitals face, promoting efficiency in the provision of services by rewarding cost/effective hospital practices." H.R.Rep. No. 98–25, 98th Cong., 1st Sess. 132, *reprinted in* 1983 U.S.Code Cong. & Ad. News 143, 219, 351.

Congress recognized that implementation of the new PPS threatened severe financial dislocations in the health care delivery system. Thus, "to minimize disruption that might otherwise occur because of sudden changes in reimbursement levels," Congress established a four-year phase-in period. S.Rep. No. 98–23, 98th Cong., 1st Sess. 53, *reprinted in* U.S.Code Cong. & Ad. News 143, 193. At the end of this phase-in period in 1987, Medicare payments were to be calculated exclusively on the basis of a "federal rate." During the transition, however, Congress directed the Secretary to determine reimbursement levels in part by reference to a "hospital-specific rate,"[1] which would be calculated for each hospital on the basis of its "allowable operating costs of in-patient hospital services" during "the preceding 12–month cost reporting period." 42 U.S.C. § 1395ww(b)(3)(A). It is the nature of this base year figure that stands at the heart of this case.

To calculate the hospitals' base year figures for use during the transition period, the Secretary turned to year-end cost reports that hospitals had already submitted. The Secretary directed his fiscal intermediaries[2] to audit these reports to determine the allowable reimbursement for their next to last year under the old payment system. For the purposes of their audits, the intermediaries assumed the validity of the Secretary's then-current regulations regarding the limits of allowable reimbursements, and in some cases the intermediaries disallowed certain costs that were apparently not permitted. The results of these audits became the agency's preliminary judgment of each hospital's base year figure.

---

**1.** The statute termed this portion the "target amount," and provided that it would play a steadily declining role in the overall calculation of Medicare reimbursements over the course of the phase-in. In the first year, 75 percent of the amount for each case would be determined on the basis of the hospital's own cost base, and the balance would be determined under the DRG prospective payment methodology. In the second year, the hospital-specific portion would count for only 50 percent; in the third year, 45 percent; and in the fourth and final year of the

phase-in, 25 percent. *See* 42 U.S.C. § 1395ww(d)(1)(C), *amended by* Pub.L. No. 99–272, § 9102(b), 100 Stat. 82, 155 (1986).

**2.** The Secretary contracts out many of his Medicare audit and payment functions to non-governmental organizations (ordinarily insurance companies such as Blue Cross), and these organizations are known as "fiscal intermediaries." *See* 42 U.S.C. § 1395h.

Over the protests of several commenters, the Secretary subsequently issued final regulations on January 3, 1984 to implement PPS. In his regulations, the Secretary attempted to shield these preliminary base year estimations from revision, and especially sought to prevent retrospective adjustments to payments for earlier transition years that had been calculated on the basis of the estimations. The Secretary conceded that "[a]n intermediary's estimation of a hospital's base year costs ... is subject to administrative and judicial review," 42 C.F.R. § 405.474(b)(3)(ii) (1984), but ruled that when this review revealed that a revision to the base year figure was in order, such a revision would only have prospective effects under PPS: although under the former "reasonable cost" system the hospitals would have received retrospective adjustments on the basis of such legal judgments, PPS base year adjustments would only become effective in the phase-in year beginning *after* the final decision on review. 42 C.F.R. § 405.474(b)(3)(i)(C)(2) (1984). The Secretary's regulations were explicit that "[t]he hospital's revised base year costs will not be used to recalculate the hospital-specific portion as determined for fiscal years beginning before the date of the ... review decision." *Id.* According to the Secretary's new regulations, the only way a hospital could have its payments revised retrospectively was if the intermediary's estimation was found to be "unreasonable and clearly erroneous in light of the data available at the time the estimation was made." 42 C.F.R. § 405.474(b)(3)(ii) (1984).[3]

Difficulties arose when the twelve hospitals in this action disputed the validity of some of the regulations upon which the intermediaries' audits were based. The hospitals challenged the application of regulations involving labor/delivery room apportionment,[4] special care units,[5] malpractice insurance,[6] and the retrospective wage index.[7] In these cases, it was determined on administrative and/or judicial review that certain costs that had been disallowed in the intermediaries' audits were in fact allowable costs for the base year. The hospitals proceeded to sue for retrospective adjustments to earlier PPS payments that had been improperly based on these invalidated regulations.

The district court concluded that the Secretary's attempt to narrow the scope of

---

3. These regulations were later recodified, without substantive change. *See* 42 C.F.R. §§ 412.-72(a)(3)(ii)(A)–(B), (b) (1987).

4. Beebe Hospital of Sussex County, Inc. has challenged the Secretary's refusal to exclude labor/delivery room days from the inpatient count in determining its allowable base year costs. In *St. Mary of Nazareth Hospital Center v. Heckler*, 760 F.2d 1311 (D.C.Cir.1985), in which Beebe was a plaintiff, this court issued a final judgment ruling against the Secretary on this issue. The Secretary has acquiesced in this decision as it resolved the labor/delivery room day issue in favor of the plaintiffs for all cost reporting years under appeal, including the "base year" of Beebe.

5. In *Greater Southeast Community Hospital v. Heckler*, 602 F.Supp. 764 (D.D.C.1985), the district court determined that the Secretary erroneously failed to treat Greater Southeast's intermediate care unit as a "special care unit" in determining its hospital specific amount. As a result of that decision, Greater Southeast received reimbursement for its 1982 fiscal year, the base year for its PPS target amount, and "collateral" relief under 42 C.F.R. § 412.72(a)(3) for PPS transition years beginning on or after January 1, 1986. The Secretary refused to grant relief

for Greater Southeast's first and second PPS years.

6. Several of the hospitals challenged the Secretary's application of 42 C.F.R. § 405.452(b)(1)(ii) (1979)—the "Malpractice Rule"—and the Secretary's refusal to apply the utilization methodology in effect before that regulation was passed in determining the allowable base year malpractice costs. Although the hospitals prevailed in their challenges, *see Walter O. Boswell Memorial Hospital v. Heckler*, 628 F.Supp. 1121 (D.D.C.1985), the Secretary subsequently promulgated a malpractice rule that applied retroactively to cost reporting years beginning as early as 1979. The Secretary maintained that this action rendered the malpractice litigation moot. This court remanded the case to the district court to consider the validity of the promulgation and the application of the Secretary's later rule. *See* Order filed November 21, 1986, *Walter O. Boswell Memorial Hospital v. Bowen*, No. 86–5099.

7. This regulation was invalidated by this court, but has been appealed to the Supreme Court. *See Georgetown University Hospital v. Bowen*, 821 F.2d 750 (D.C.Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1073, 99 L.Ed.2d 232 (1988).

judicial review of the base year determinations was not in accordance with the Medicare statute, and ordered the retrospective payments. The issue before this court is the relatively narrow one of what Congress intended by directing the Secretary to calculate transition period payments by reference to costs that were "allowable" under the reasonable cost system.[8]

## II. ANALYSIS

### A. Standard of Review

In reviewing an agency's construction of a statute, this court looks first to "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If a statute is silent or ambiguous, a court may assume that Congress implicitly delegated the interpretive function to the agency, but no such delegation may be found where Congress' intent is clear. *Id.* at 842–44, 104 S.Ct. at 2781–83. "The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986).

■ Our inquiry into congressional intent must encompass both the particular language, as well as the broader design of the statute. *K Mart Corp. v. Cartier, Inc.*, — U.S. ——, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). We must also search the available legislative history to shed light on the statutory language. "In conducting this inquiry, 'we are not re-

quired to grant any particular deference to the agency's parsing of statutory language or its interpretation of legislative history.'" *Washington Hospital Center v. Bowen*, 795 F.2d 139, 143 (D.C.Cir.1986) (*quoting Rettig v. Pension Benefit Guaranty Corp.*, 744 F.2d 133, 141 (D.C.Cir. 1984)).

Having conducted this inquiry, we conclude that the intent of Congress in § 1395ww is clear.[9] "[T]hat," then, "is the end of the matter." *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781.

### B. Statutory Language

■ The Medicare statute directs the Secretary to calculate the hospital specific portion of reimbursement rates on the basis of "the allowable operating costs of in-patient hospital services ... recognized under this title for such hospital for the preceding 12–month cost reporting period...." 42 U.S.C. § 1395ww(b)(3)(A). In the most direct language, therefore, Congress clearly ordered that costs that were "allowable" under the old system were to remain a component of payment rates during the phase-in period of the new system. "Allowable," in turn, invokes a straightforward concept: if the reasonable cost system would have reimbursed a hospital for a given cost, it was "allowable" and should become a factor in determining a hospital's base year figure.

It is also clear that under the reasonable cost system, a preliminary ruling by the Secretary that a cost is non-reimbursable does *not* necessarily mean that the cost is not "allowable" within the meaning of the statute. Rather, a final ruling on allowable costs often comes only after extensive administrative and/or judicial review. *See* 42 U.S.C. § 1395oo (f)(1). When Congress

---

8. The appellees in this action concede that they are entitled to adjustments only after they succeed in obtaining a final order in their favor that is no longer subject to further review.

9. The Secretary attempts to demonstrate ambiguity by arguing that although the statute requires calculations based on "allowable" costs, it does not state "what, if any, consequences should occur if any of [the Secretary's] estimates ... should prove to have been understat-

ed." Brief for Appellant at 26. But Congress intended the *same* consequences to arise during the phase-in as arose under the former reasonable cost system. As we explain below, Congress incorporated into PPS a significant portion of the former reasonable cost system—including its provisions for review and retrospective adjustments—when it made reference to "allowable" costs under that system. The alleged "ambiguity" therefore evaporates.

chose to incorporate the concept of "allowable" costs into the transitional payment system, it must surely have been aware of the statutory review process for such costs and how such review would inevitably inform the content of any definition of the term "allowable";[10] we can find no cause to conclude that Congress nevertheless meant to convey some different, more qualified meaning for the term "allowable" without telling us what it was. As the district court explained, "A final administrative or judicial decision ... that a particular cost was, indeed, 'allowable' in the base year should provide conclusive proof that the cost should be included in the provider's [hospital specific amount] for the PPS year under appeal." *Georgetown Univ. Hospital v. Bowen*, 698 F.Supp. 290, 296 (D.D.C.1987).

The Secretary, however, argues that despite Congress' reference to "allowable" costs, the scheme embodied in the PPS *requires* prospective estimates of the different components of the fixed rates, and the application of traditional ratemaking principles counsels against retrospective adjustments when these estimates, though reasonable when made, are subsequently revealed to be in error. *See* Brief for Appellant at 27–32 (relying on *Transcontinental & Western Air, Inc. v. CAB*, 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911 (1949)). The Secretary's argument would carry more weight if Congress had not elaborately outlined a four-year phase-in period that clearly signalled an intent to keep certain elements of the former system in place at least temporarily—elements that would in the end be abandoned altogether, but which were nevertheless included in order to minimize financial disruptions. But Congress did provide for such a transitional stage, and we cannot ignore its express provisions.

The Secretary's reading of the statute might also be better justified if Congress had directed him to calculate transition rates on the basis of *"estimates of* allowable operating costs" during the base year. Indeed, the Secretary acknowledges that elsewhere in the same section of the statute Congress expressly indicated when the Secretary's estimates would constitute key components of the PPS rates, including *"estimated* average rate of change of hospital costs," "an *estimate* of indirect medical education costs," and outlier payments "as *estimated* by the Secretary." *See* 42 U.S.C. § 1395ww(d)(1)–(3) (emphasis added). In these passages and others, Congress showed that it knew how to enshrine estimates into the rate calculations when it so desired. But in subsection (b)(3)(A), Congress provided that all "allowable" costs were to be included, and in no way suggested that the preliminary estimates thereof, although administratively necessary, would somehow become final and unalterable before the review process under the statute had been completed.[11]

In the face of the plain meaning of this statutory provision, the Secretary has chosen a reading that forces him into an anomalous position. If a court rules that a given regulation was invalid as applied to a particular hospital during its base year (under the reasonable cost system), the Secre-

---

**10.** The Secretary appears to consider such a legal determination as nothing more than "data" that was not available to the intermediary when it made its audit. But the information that is at issue here is qualitatively different from, for example, an estimate about the inflation rate that turns out to be overstated. The Secretary can make predictive errors in this way and still remain within the statute's requirements. But when the Secretary applies regulations that are later deemed *legally* invalid, his actions are outside the terms of the statute, and they cannot so easily be protected from subsequent revisions.

**11.** The Secretary answers that Congress also used the term "allowable" in the statute when it clearly called for estimates, but he did not direct us to any particular passage as illustrative of his argument. After searching the relevant sections ourselves, however, we note that when the PPS statute instructs the Secretary to determine "allowable operating cost per discharge" under the *new* prospective payment methodology, *see* 42 U.S.C. § 1395ww(d)(2)(A), it invokes an entirely different sense of the term: costs that are allowable under the new system may *not* be subject to subsequent retrospective revision, but that certainly does not mean that the same must be true when the statute refers to costs that were "allowable" under an entirely different payment methodology.

tary is prepared to admit, as he must, that the cost was "allowable" for that base year, and the hospital is entitled to a retrospective adjustment in its Medicare reimbursement for that year. Moreover, the Secretary has further agreed that such a ruling also clarifies what costs would be prospectively "allowable" under the phase-in to PPS. Yet, according to the Secretary's reading, something indefinable about the period in between renders the definition of "allowable" different for those intermediate years. We do not share the Secretary's perception that there is an ephemeral "something" out there that requires such different consequences. Instead, we fear that his approach effectively cemented unlawful calculations into the transition year payments by largely insulating them from review.[12] This court will not graft such an improbable reading onto the clear directive of the statute.

## C. *Legislative History*

Our "plain meaning" reading of the statutory provision in § 1395ww is consistent with the available legislative history. Although the Secretary focuses narrowly on one particular passage in the legislative history to support his interpretation of the statute, the passage simply cannot be made to support the weight he tries to force on it.

The Secretary notes that in the Conference Report accompanying the 1983 amendments, the congressional managers of the amendments recognized that "[s]ince the hospital's specific portion of the rate must be determined in advance of the hospital's first fiscal year under the system, [they] expect the Secretary will use the best data available at that time to determine operat-

ing costs for the purposes of the phase-in." H.R.Conf.Rep. No. 98–47, 98th Cong., 1st Sess. 182, *reprinted in* 1983 U.S.Code Cong. & Ad. News 404, 472. Standing by itself, this passage suggests nothing more than common sense: in requiring HHS to come up with numbers in advance, Congress intended the Secretary to use the best available data. But the Secretary attempts to transform this unremarkable language into a much broader prohibition against retrospective adjustments when the estimates of allowable base year costs turn out to be incorrect. In light of the clear meaning of the language in the statute itself, which conveys the contrary sense, this passage simply cannot be stretched to cover this issue. "[D]escriptive language in congressional reports as general as these references cannot override the plain meaning of the statutory language in which Congress has directly expressed its intentions." *Washington Hospital Center*, 795 F.2d at 149.

Equally significant, in the immediately preceding passage, the Conference Report signalled the estimates with which it was primarily concerned:

> The managers recognize that, in some cases, the Secretary will have to use estimates to adjust some portions of the hospital's base year experience to make it comparable to inpatient operating costs that will be paid under the prospective system—*e.g.*, *FICA taxes that would have been paid if the hospital had been in the social security system or the adjustment needed to exclude the nursing differential which is no longer payable.*

H.R.Conf.Rep. No. 98–47, 98th Cong., 1st Sess. 181–82, *reprinted in* 1983 U.S.Code

---

**12.** As the district court noted, the judicial review provisions of the statute provide further evidence that Congress intended to afford full retroactive relief to hospitals injured by an erroneously understated base year figure. For example, the Medicare statute, 42 U.S.C. § 1395oo (f), incorporates the judicial review framework of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A), which requires courts reviewing an agency action to set it aside if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." As the court explained, "This statute clearly requires a court to set aside an intermediary's decision

that directly conflicts with a final and binding court precedent since such a decision would not be 'in accordance with law.'" *Georgetown University Hospital v. Bowen*, 698 F.Supp. 290, 297 (D.D.C.1987). Furthermore, the legislative history of the PPS provisions expressly noted that the new legislation "would provide for the same procedures for administrative and judicial review of payments under the prospective system as is currently provided for cost-based payments." H.R.Rep. No. 98–25, 98th Cong., 1st Sess. 143, *reprinted in* 1983 U.S.Code Cong. and Ad. News 219, 362.

Cong. & Ad. News 404, 471–72 (emphasis added). To be sure, this excerpt anticipates the need for certain estimates. But it is significant that Congress considered these estimates necessary in order to make adjustments *to* "the hospital's base year experience." Congress thereby implicitly created two categories of figures: a hospital's base year figure, which stands as a discrete core concept *not* understood by Congress to consist of estimates, and figures required to make adjustments to these core figures, which this passage suggests would have to consist of estimates. Thus, while this quotation lends credence to the Secretary's suggestion that some estimates were contemplated by Congress, it does not support the argument that a hospital's allowable base year costs were among that group.

Moreover, although the legislative history reveals a congressional desire for "predictibility [sic] regarding payment amounts," H.R.Rep. No. 98–25, 98th Cong., 1st Sess. 132, *reprinted in* 1983 U.S.Code Cong. & Ad.News 219, 351, it also shows that the statute provided the phase-in period "to minimize disruptions that might otherwise occur because of a sudden change in reimbursement policy." *Id.* at 136 and 355. The phase-in as a whole reflected Congress' recognition that the PPS was both a radically new method for determining Medicare reimbursement, and a system that would (it was hoped) contain Medicare expenses. PPS marked a sharp policy shift, the impact of which Congress tempered significantly through its phase-in. However, even the Secretary concedes that initial "errors" contained in the intermediaries' audits tended systematically to understate the base year level. Brief for

Appellant at 12. Any later adjustments to this particular figure would almost certainly move it upward, since the HHS rules relied upon by the intermediaries were presumably only open to challenge from hospitals seeking more reimbursement. The Secretary's approach therefore has the effect of paring back hospital payments even further than was envisioned by the terms of PPS. It is implausible for the Secretary to suggest that Congress intended these results to flow from its phase-in scheme: by all outward appearances, the transition period was designed to soften the blow dealt by the new system to hospitals, but, according to the Secretary's interpretation, this period would effectively become a Trojan horse inside which a further cost-cutting measure was hidden.

The Secretary invokes the broader purposes of the statute to justify his regulations: he argues that "the core of a prospective system—its forward-looking point of view—demands that the rate be capable of certain determination prior to the provision of services." Reply Brief at 3.[13] Of course, this analysis carries no weight insofar as it contravenes the express scheme we find Congress intended for the transition to PPS. On another level, however, the Secretary's analysis emphasizes only one aspect of a prospective payment system. As the House Report explained, "the 'reasonable cost' reimbursement system simply responds to hospital cost increases by providing increased reimbursement." H.R.Rep. No. 98–25, 98th Cong., 1st Sess. 132, *reprinted in* 1983 U.S.Code Cong. & Ad. News 219, 351. By eliminating this permissive reimbursement policy and replacing it with a fixed reimbursement scheme, Congress sought to provide incentives for hospitals to minimize their costs in

**13.** The Secretary also suggests that the Department has been "consistent" in refusing to permit retrospective adjustments under the statute. He argues that other instances where his policy has *favored* the hospitals (and which the hospitals naturally do not challenge here) in the end balance the "equities." Brief for Appellant at 31. Of course, if a policy is not in accordance with the governing law, then consistency in the pursuit of that policy is no virtue. More to the point, however, the fact that the Secretary has concluded that his estimates of certain figures under PPS are not subject to later revision does

not determine the appropriate method of dealing with estimates based on invalid regulations. And even if retrospective payments in this case do tend to favor the hospitals, we do not have the opportunity here to review the "panoramic equity" of the Medicare reimbursement scheme, *St. Mary of Nazareth Hospital Center v. Heckler,* 760 F.2d 1311, 1318 (D.C.Cir.1985). Finally, we note that it is not at all inconsistent with Congress' purposes in phasing in PPS that the transition payments err on the side of cushioning the economic jolt involved in the implementation of the new system.

**330**

order to maximize their profit margin on Medicare payments. To this extent, then, the new Medicare scheme reflects "traditional" ratesetting principles relied on by the Secretary: fixed rates set upfront encourage industry to trim its costs to stay within these rates, while retrospective adjustments undermine such incentives. The Secretary goes on to argue, however, that the crucial element of the system is certainty as to what the prospectively set payment figure will be at any given time; only by knowing this figure in advance, he suggests, will hospitals have the proper incentives to economize.

On a more realistic level, however, the real linchpin of the system may not be that the exact reimbursement *figure* is known in advance, but rather may be that the hospital knows that nothing it does in providing services will lead to a higher reimbursement level. That is, if an extra dollar spent on a patient will not increase the Medicare reimbursement, and an extra dollar saved will not decrease the reimbursement, there is a strong incentive to keep down costs *regardless* of what the final payment will be. The retrospective adjustments to the hospitals' payment levels contemplated in this case are not tied to the hospitals' behavior during the transition; the adjustments are instead a result of legal determinations pertaining to historical costs incurred by the hospitals under the previous system. The incentives faced by hospitals to keep costs down under PPS should therefore remain unaffected by the government's willingness to make the adjustments at issue here: so long as payments are not tied to hospitals' behavior while PPS is in effect, the government sends no message that profligacy will result in larger payments. The Secretary's reasoning to the contrary does not provide grounds for assuming that Congress intended its transition scheme to be applied in any way other than as it was plainly expressed.

### III. CONCLUSION

The Secretary's real complaint in this case appears to be with the scheme devised by Congress to phase in the new prospective payment system. Although it may be

true that Congress could have implemented its program more quickly or more decisively, it opted instead for a transition period that by its terms incorporated a legally significant component of the former system—a base year figure based on "allowable" operating costs. The phase-in created a hybrid of the old and the new. As a result, certain features of the old system continued to control the Medicare reimbursement process through the transition period. We conclude that the district court's judgment was correct insofar as it ordered the Secretary to recompute the target amount component of the prospective payment rates of appellees to conform with final judgments that these rates were initially calculated on the basis of invalid legal assumptions.

AFFIRMED.

MIKVA, Circuit Judge, concurring:

I concur in the decision and excellent opinion of the Chief Judge, except for the expendable discussion of legislative history. I believe that when the plain meaning of a statute is found, it is unnecessary and unwise to delve further.