963 F.2d 1206
 37 Soc.Sec.Rep.Ser. 293, Medicare & Medicaid Guide
P 40,233
COMMUNITY HOSPITAL OF CHANDLER, INC., an Arizona
Corporation, d/b/a Chandler Regional Hospital,
Plaintiff-Appellant,
v.
Louis W. SULLIVAN, M.D., in his official capacity as
Secretary of the United States Department of
Health and Human Services, Defendant-Appellee.
 No. 90-16331.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 11, 1992.
Decided May 4, 1992.
As Amended July 10, 1992.
 
 Patrick K. O'Hare, Amy E. Hancock, McDermott, Will, & Emery, Washington, D.C., and Douglas Gerlach, Brown & Bain, Phoenix, Ariz., for plaintiff-appellant.
 Stuart Gerson, Asst. Atty. Gen., James P. Loss, Asst. U.S. Atty., Phoenix, Ariz., Lawrence M. Meister, Office of the Gen. Counsel, Dept. of Health and Human Services, Baltimore, Md., for defendant-appellee.
 Appeal from the United States District Court for the District of Arizona.
 Before: FLETCHER, D.W. NELSON and FERNANDEZ, Circuit Judges.
 D.W. NELSON, Circuit Judge:
 
 OVERVIEW
 
 1
 Until 1984, Chandler Community Hospital operated in a single-story, 46-bed, small-scale facility. That year, the original facility was closed down and the operation was transferred to a brand-new, four-story, 120-bed, state-of-the-art facility that had been constructed at a nearby location. The new facility was renamed "Chandler Regional Hospital," but it kept the same licenses as the old facility; it was also owned and operated by the same individuals. The new facility had substantially higher per-patient operating costs than the old facility.
 
 
 2
 This case raises two questions. First, we must decide whether, for the purpose of calculating Medicare reimbursements, the Secretary of Health and Human Services' ("the Secretary") determination that the new facility is not a "new hospital" within the meaning of 42 C.F.R. § 412.74(a)(1) frustrates the Congressional intent behind the Medicare Act. Second, we must determine whether, if the interpretation of the new hospital regulation was valid, the Secretary was nonetheless required, under 42 U.S.C. § 1395ww(b)(4)(A), to otherwise adjust Chandler's reimbursement rate to take into consideration the radical shift in its operating costs.
 
 
 3
 We hold that neither 42 C.F.R. § 412.74(a)(1) nor the Secretary's interpretation of that regulation to exclude Chandler from characterization as a new hospital frustrate Congressional intent. However, we find that the Secretary erred in not adjusting Chandler's base year costs as required by 42 U.S.C. § 1395ww(b)(4)(A). Therefore, we reverse the district court and remand this case so that the Secretary may have an opportunity to determine whether and to what extent Chandler is entitled to adjustments under that provision. 744 F.Supp. 203. (D.Ariz.1990).
 
 FACTS/PROCEDURAL BACKGROUND
 Overview of the Medicare Program
 
 4
 In 1983, Congress amended the Social Security Act to change the way it reimburses hospitals for the costs of treating Medicare patients. Before 1983, hospitals were reimbursed according to the actual costs they expended in treating each Medicare patient. Concluding that this cost-based system was inefficient because hospitals had no incentive to provide services at lower costs, Congress introduced the Prospective Payment System (PPS). Under PPS, hospitals receive a fixed, standard amount for each Medicare inpatient they treat. The amount of the payment is adjusted for each patient by using "diagnosis-related groups" (DRGs), a classification system based on the patient's condition and treatment. This amount is theoretically equal to the "average" cost per patient. Hospitals receive the per patient DRG amount no matter how much each spends on a given patient. Hospitals that treat patients for less than the DRG amount get "rewarded," while hospitals that spend more than the DRG amount must absorb the excess costs.
 
 
 5
 Recognizing that the PPS system might create financial disruption for hospitals accustomed to cost-based reimbursement, Congress designated a four-year transition period to help hospitals ease into the new system. For those four years, Congress based a hospital's reimbursement on a formula incorporating both the PPS payment amount and an amount reflecting that particular hospital's past operating costs (the hospital-specific portion--"HSP"). Congress directed the Secretary to base the HSP on a hospital's costs for a "base-year" period of twelve months ending on or before September 30, 1983. Congress further directed that the HSP share of the formula be gradually reduced to zero over the course of the four-year transition period; correspondingly, the PPS amount was to rise to 100 percent.
 
 
 6
 Congress recognized that for a small number of hospitals, such as new hospitals, there would be no historical cost experience from which to calculate the HSP. Although Congress passed no statute directly addressed to hospitals falling in this category, the legislative history indicates that Congress intended that the Secretary "make appropriate provision for applying a prospective payment system." H.R.Rep. No. 25, 98th Cong., 1st Sess. 137, reprinted in 1983 U.S.Code Cong. & Admin.News 219, 356. Accordingly, the Secretary issued 42 C.F.R. § 412.74(a). This regulation defines "new hospitals" as follows:
 
 
 7
 (a) For purposes of this section, a new hospital is a hospital that meets either of the following requirements:
 
 
 8
 (1) The hospital--
 
 
 9
 (i) Is newly participating in the Medicare program (under previous and present ownership); and
 
 
 10
 (ii) Does not have a 12-month cost reporting period ending before September 30, 1983.
 
 
 11
 (2) The hospital is under new ownership and can document to the satisfaction of its intermediary that--
 
 
 12
 (i) Its base period reflects previous ownership and control under which the hospital's operation was deliberately phased out in expectation of sale or termination of operations;
 
 
 13
 (ii) Its occupancy rate during the current period is 150 percent of the occupancy rate during the base year;
 
 
 14
 (iii) Previous ownership and management took deliberate steps to curtail services in the base period by reducing operations, laying off or transferring employees to non-inpatient areas, reducing physician staff, and reducing inpatient admissions; and
 
 
 15
 (iv) The change in ownership and the corresponding growth in inpatient services and occupancy occurred between the base period and the first prospective payment period.
 
 
 16
 42 C.F.R. § 412.74(a). At issue in this case is 42 C.F.R. § 412.74(a)(1), as it is this definition of "new hospital" that Chandler contends it satisfies. The Secretary determined that because such facilities had no historical cost experience, they would be reimbursed from the outset at the PPS rate. 42 C.F.R. § 412.74(b).[1]
 
 
 17
 Community Hospital of Chandler/Chandler Regional Hospital
 
 
 18
 Chandler Community Hospital ("CCH"), a single-story facility located on a five-acre site, was opened in 1962. CCH was licensed for 46 beds, divided between four-bed wards and semi-private rooms. CCH closed in 1984, just before Chandler Regional Hospital ("Chandler") was opened.
 
 
 19
 Chandler is a four-story, "state-of-the-art-facility" which occupies 40 acres and is located about seven miles from the site of the old facility. Chandler is licensed for 120 beds, all in private rooms. Chandler has a 12-bed intensive care unit, an 8-bed maternity unit, a 15-bed pediatric unit and a 15-bed cardiac care unit, and it provides numerous other services not available at CCH. Chandler treats twice as many patients as CCH did, and employs a staff more than twice as large.
 
 
 20
 The administrators of CCH planned and oversaw the construction and opening of Chandler. When CCH closed in March 1984, its patients were simply transferred to Chandler. Rather than obtain new Medicare certification, Chandler's management asked the state licensing authorities to "transfer" CCH's Medicare certification to Chandler. And rather than file separate annual cost reports with Medicare, management "combined" the costs of CCH and Chandler in a single 1984 report.
 
 
 21
 Carrying out his mandate under Congressional directives, the Secretary calculated Chandler's reimbursement rate for the four-year transition period by determining that Chandler's "base-year" would be the cost year ending in December 12, 1982. In 1982, of course, the new facility did not exist; the selected base-year reflects costs incurred at CCH. Although Chandler and the Secretary disagree on the extent of the disparity, there is little question that the base-year on which the Secretary based Chandler's HSP is unrepresentative of Chandler's actual annual operating costs for the transition period. The resulting reimbursement rate is lower than the PPS reimbursement rate.
 
 Proceedings Below
 
 22
 Seeking to recover additional Medicare money, Chandler filed a complaint with its fiscal intermediary. Chandler argued that it did not have an appropriate "historical cost experience," and therefore it qualified as a hospital for which the Secretary should "make appropriate provision for applying a prospective payment system." Specifically, Chandler argued that as it was both "newly participating in the Medicare program" and did not have "a 12-month cost reporting period ending before September 30, 1983," it met the definition of a "new hospital" reflected in 42 C.F.R. § 412.74(a)(1). On instructions from the Health Care Financing Administration ("HCFA") (the Secretary's designee), the fiscal intermediary denied Chandler's request to be treated as a new hospital. Chandler appealed the HCFA's decision to the Provider Reimbursement Review Board (PRRB) pursuant to 42 U.S.C. § 1395oo. In a 3-1 decision, the PRRB held that Chandler did not meet the definition of "new hospital." The dissenting member of the PRRB opined that not only did Chandler qualify as a "new hospital" under 42 C.F.R. § 412.74(a)(1), but also that the Secretary's failure somehow to compensate for Chandler's unique cost situation violated 42 U.S.C. § 1395ww(b)(4)(A). The PRRB's decision was affirmed by the Acting Administrator of HCFA.
 
 
 23
 The Acting Administrator's decision was a final agency action pursuant to 42 U.S.C. § 1395oo (f)(1). Chandler timely filed suit against the Secretary in district court; the district court rejected Chandler's arguments and granted summary judgment to the Secretary. This timely appeal ensued.
 
 DISCUSSION
 A. Standard of Review
 
 24
 A district court's grant of summary judgment is reviewed de novo. Vance v. Hegstrom, 793 F.2d 1018, 1022 (9th Cir.1986); Regents of the University of California v. Heckler, 771 F.2d 1182, 1187 (9th Cir.1985).
 
 
 25
 "Judicial review of Medicare reimbursement decisions is governed by the Administrative Procedure Act, 5 U.S.C. §§ 701-06 (1982), which requires a court to set aside agency actions found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law ...' Id. at § 706." Regents, 771 F.2d at 1187. "Although an agency's interpretation of the statutory scheme under which it operates is entitled to considerable deference, we must reject an agency's interpretation that is inconsistent with the statute's meaning." Sunshine Health Systems v. Bowen, 809 F.2d 1390, 1394 (9th Cir.1987); see also Adams House Health Care v. Bowen, 862 F.2d 1371, 1374 (9th Cir.1988) ("[W]e must reject agency rules that thwart the expressed intent of Congress").
 
 B. Analysis
 
 26
 1. 42 C.F.R. § 412.74(a)(1) and Congressional Intent
 
 
 27
 In claiming that the Secretary's "new hospital" regulation frustrates Congressional intent, Chandler advances two arguments. First, it argues that by reimbursing Chandler at a lower rate during the transition period than the rate to which Chandler is entitled after the transition period, the Secretary has frustrated Congress's intent to "give hospitals a break" during the transition period. Second, it argues that the regulation frustrates Congressional intent by defining hospital as an institution rather than a facility.
 
 
 28
 Congress has not explicitly identified "new hospitals" as a particular problem, or directed the Secretary to deal with them in any particular manner.[2] Therefore, because no specific provision of the Medicare Act is at issue, Chandler can only challenge the Secretary's decision if it can show that the decision conflicts with the overall purpose of the Medicare statute. An agency's regulations must be consistent with the overall intent behind a statute. Adams House, 862 F.2d at 1374; Georgetown University Hospital v. Bowen, 862 F.2d 323, 326 (D.C.Cir.1988) ("[O]ur inquiry into congressional intent must encompass both the particular language, as well as the broader design of the statute.").
 
 
 29
 a. Congressional Intent Regarding the Transition Period
 
 
 30
 Chandler's first argument centers on legislative history which indicates that Congress wanted to ease hospitals' transition from cost-based reimbursement to PPS. Both sides agree that Congress's intent in passing the 1983 amendments was to move hospitals toward providing more cost-effective health care, and that Congress created the four-year transition period in order to minimize financial disruption for hospitals accustomed to the cost-reimbursement system. As Chandler points out, the legislative history explicitly states that the purpose of the transition period was "to minimize disruptions that might otherwise occur because of a sudden change in reimbursement policy." H.R.Rep. No. 25, 98th Cong., 1st Sess. 136, reprinted in 1983 U.S.Code Cong. & Admin.News 219, 355.
 
 
 31
 Chandler, however, reads more into this sentence. It argues that Congress intended the transition period to "give hospitals a break," contending, in essence, that the four years was meant not only to minimize financial disruptions but to reduce financial hardship. This view has apparently been taken by some courts analyzing related reimbursement problems. See, e.g., The Methodist Hospital et. al. v. Sullivan, 1990 Medicare & Medicaid Guide (CCH) p 39,627, at 28,117, 1991 WL 263110 (D.D.C. Sept. 20, 1991) ("[B]y all outward appearances, the transition period was designed to soften the blow dealt by the new system to hospitals") (quoting Georgetown University, 862 F.2d at 329). Chandler thus argues that because the Secretary has interpreted his regulations so that Chandler gets less money during the transition period than after that period, the Secretary has caused a perverse result and frustrated Congressional intent.
 
 
 32
 We find Chandler's characterization of Congressional intent in this regard unpersuasive. First, and most important, Chandler ignores the sentence in the legislative history that directly precedes the sentence on which it relies so heavily. This statement reads as follows: "Payments under the new prospective payment system would not be designed to reflect a hospital's cost situation and therefore can be expected to result in Medicare reimbursement gains and losses for hospitals in relation to what they would have received under present law." H.R.Rep. No. 25, 98th Cong., 1st Sess. 136, reprinted in 1983 U.S.Code Cong. & Admin.News 219, 355 (emphasis added.) This statement indicates that Congress recognized that some hospitals would benefit financially under the PPS system. Obviously, those hospitals would receive less during the transition period--when their payments would reflect both their lower historical costs and the higher PPS amounts--than later, when their reimbursement would be based solely on the higher PPS amounts. Thus, the simple fact that some hospitals, like Chandler, "do worse" during that transition period than they do after the new reimbursement system is fully effected does not frustrate any Congressional intent.
 
 
 33
 Chandler's position is further undermined when one considers the manner in which Congress must have determined the PPS reimbursement amounts. Reimbursement amounts under PPS were designed to reflect some sort of national average for the treatment of comparable patients. Although Congress may have selected fairly low "averages," some hospitals must have been treating patients for less than the figures selected, for otherwise no hospital would be rewarded for efficiency. Obviously, this class of hospitals would not enjoy as high a reimbursement rate during the transition period as it would during the post-transition years.
 
 
 34
 Finally, we think it relevant that Congress did not write into law a provision permitting hospitals to opt for PPS and bypass the transition period altogether if they so chose. Because Congress must have known that some hospitals would be better off under PPS than during the transition period, its failure to enact such a provision seems to be a further indication that it did not design the transition period such that hospitals would get the highest reimbursement possible.
 
 
 35
 For these reasons, we find Chandler's characterization of Congressional intent vis-a-vis the transition period incorrect. 42 C.F.R. § 412.74(a) does not frustrate Congressional intent merely because its application costs Chandler money.
 
 
 36
 b. Congressional Intent to Define "Hospital" as "Facility"
 
 
 37
 Rather than "Institution"
 
 
 38
 Chandler's second argument centers on the relationship between the Secretary's interpretation of the new hospital regulation and the manner in which Congress structured the entire PPS system. In interpreting the regulation so as to exclude Chandler, the Secretary maintains that a "hospital" is not "merely a building or group of buildings," but that it is a "business organization or institution." In refusing to define Chandler as a new hospital, the Secretary focuses on the Chandler/CCH management's failure to obtain a new provider number for the new facility and their filing of a "combined" annual cost report in 1984. In response, Chandler argues that because the Secretary focuses on ownership and the continuity of legal and business entities, rather than on physical facilities and their site-specific operating costs, this interpretation is at odds with the manner in which Congress intended the Secretary to calculate a hospital's Medicare reimbursement rates. According to Chandler, for its new facility to be saddled with costs attributable to the old CCH facility is completely contrary to Congressional intent.
 
 
 39
 The Secretary argues that its interpretation of "hospital" "coheres" with the definition of "hospital" contained in the Medicare Act, see 42 U.S.C. § 1395x(e), and with the Act's Medicare provider participation requirements. Under 42 U.S.C. § 1395x(e), "[t]he term 'hospital' ... means an institution which" meets certain requirements. The Secretary points out that many of these requirements make sense only as applied to business organizations. For example, a facility must have bylaws with respect to its staff of physicians, 42 U.S.C. § 1395x(e)(3), and must maintain clinical records on patients, 42 U.S.C. § 1395x(e)(2). The provisions dealing with the Medicare provider participation requirements, contained in 42 U.S.C. § 1395cc, similarly appear to treat a hospital as a business organization required to bill patients, file paperwork with the Secretary, and renew "contracts" with the Secretary to guarantee continued participation.
 
 
 40
 For its part, Chandler relies on several provisions in the Medicare Act which seem to indicate that, for the purposes of PPS, a hospital's reimbursement rate should reflect its physical operations rather than its legal relationships. Chandler points to provisions intended to reflect differences in local wage rates, 42 U.S.C. § 1395ww(d)(2)(H), and the cost differences between urban and rural hospitals, 42 U.S.C. § 1395ww(d)(2)(D). Congress also directed the Secretary to account for the special needs of sole community hospitals, 42 U.S.C. § 1395ww(d)(5)(C)(ii), as well as for the hardships presented by unusually costly cases, 42 U.S.C. § 1395ww(d)(5)(A). Chandler also points to provisions of 42 U.S.C. § 1395x(e) that seem to refer to an individual facility rather than a legal or business organization. These provisions refer to such things as a facility's ability to attract sufficient personnel and its compliance with fire and safety requirements, 42 U.S.C. § 1395x(e)(B), (C), and requirements that a facility have a licensed nurse "on duty at all times." 42 U.S.C. § 1395x(e)(5). In response to the Secretary's argument regarding Medicare provider participation requirements, Chandler points out that the Secretary has elsewhere taken the position that the "provider" of Medicare services is the facility, not the institution, see Board of Trustees of State Institutions of Higher Learning v. Sullivan, 763 F.Supp. 178 (S.D.Miss.1991), and that the manner in which a hospital is treated under the Medicare provider program is not necessarily dispositive of that hospital's status for PPS reimbursement. Sunshine Health, 809 F.2d 1390 (finding that qualification as a "new provider" under 42 C.F.R. § 405.460(e)(2)(1985) did not mandate treatment as "new hospital" under 42 C.F.R. § 412.74(a)).
 
 
 41
 Both the Secretary and Chandler mischaracterize the contents of the Medicare Act. We find that 42 U.S.C. § 1395x(e) as well as those provisions dealing with PPS reimbursement anticipate that a hospital can be a "facility" for some purposes and an "institution" for others. We, of course, need not resolve this dispute in favor of either party, as the implications of this conclusion for the purposes of our inquiry are quite simple. In the absence of a clear indication of Congressional intent, we must defer to the Secretary's promulgation and interpretation of its regulations. It is well settled law that where Congress has not clearly "spoken" to a particular issue, a reviewing court must treat the Secretary's regulations with a greater degree of deference. See, e.g., Fmali Herb, Inc. v. Heckler, 715 F.2d 1385, 1387 (9th Cir.1983). Chandler has not demonstrated a clear Congressional intent to define hospital in this context as a facility rather than an institution. Under these circumstances, we think that extra degree of deference well-warranted. In short, because we can ascertain no clear Congressional intent to define "hospital" for the purposes of PPS reimbursement as a "facility," we defer to the Secretary's promulgation and interpretation of 42 C.F.R. § 412.74(a)(1). The Secretary's actions are simply not "arbitrary or capricious."[3]
 
 
 42
 2. The Secretary's Mandate under 42 U.S.C. § 1395ww(b)(4)(A)
 
 
 43
 In the alternative, Chandler argues that the Secretary's failure to adjust its base-year costs to reflect the radical increase in its operating costs violates 42 U.S.C. § 1395ww(b)(4)(A), which requires that a hospital's base-year costs be indicative of its actual operating costs during the transition years. Chandler contends that under this provision, the HSP integrated into a hospital's transition period reimbursement must be calculated to reflect both the hospital's historic costs and any special circumstances surrounding costs incurred during the base-year period:
 
 
 44
 The Secretary shall provide for an exemption from, or an exception and adjustment to, the method under this subsection for determining the amount of payment to a hospital where events beyond the hospital's control or extraordinary circumstances, including changes in the case mix of such hospital, create a distortion in the increase in costs for a cost reporting period (including any distortion in the costs for the base period against which such increase is measured.)
 
 
 45
 42 U.S.C. § 1395ww(b)(4)(A) (emphasis added). See also H.R.Conf.Rep. No. 47, 98th Cong., 1st Sess. 181-82, reprinted in 1983 U.S.Code Cong. & Admin.News 404, 471-72 (same). Arguing that CCH's historical costs have nothing to do with Chandler's current circumstances, Chandler claims that the Secretary's failure to adjust its base-year costs violates this statute.
 
 
 46
 Although Chandler did not explicitly raise this argument below, we think it proper to consider at this time. We find that Chandler constructively raised it by arguing before the various tribunals that the Secretary's action leaves "hospitals like Chandler which constructed replacement facilities subsequent to the base year without a meaningful remedy under the regulations" and by invoking 42 U.S.C. § 1395ww(b)(4)(A) from the outset of this litigation. The record indicates that the tribunals below, as well as the Secretary, were apprised of the argument. We note in particular the dissenting opinion of Arthur Owens, PRRB member. In his opinion, Mr. Owens states that Chandler's "adjustment is in conflict with ... 42 U.S.C. § 1395ww(b)(4)(A)" and that "in this case, a gross distortion occurred between the base year and the first PPS year." Similarly, before this court, the Secretary takes issue with the meaning of 42 U.S.C. § 1395ww(b)(4)(A), but nowhere contends that Chandler has forfeited its right to make this argument by not raising it below. Finally, we think that a liberal construction of Chandler's argument with regard to 42 U.S.C. § 1395ww(b)(4)(A) is appropriate because, as counsel for the Secretary conceded at oral argument, the Secretary has not promulgated regulations which would make clear to a facility in Chandler's position the procedure for requesting a base-year cost adjustment pursuant to that statute.
 
 
 47
 We hold that the Secretary has not fulfilled his obligations to Chandler under 42 U.S.C. § 1395ww(b)(4)(A). Whether or not Chandler is a "new hospital" under 42 C.F.R. § 412.74(a)(1), it is a hospital which has experienced a "distortion in the costs for the base period." To the extent that Chandler's base year reflects costs incurred at CCH, it is unrepresentative of actual costs at Chandler. The Secretary's failure to make some adjustments to this base-year cost figure violates 42 U.S.C. § 1395ww(b)(4)(A)'s requirement that the Secretary "shall provide for an exemption from, or an exception to adjustment to" the normal process of calculating a hospital's base year cost. The Secretary's argument that Chandler has been adequately reimbursed because the case mix index and per patient DRG level have risen at the new facility is of no moment. The provision in question clearly speaks of adjustments to the base-year costs, not of adjustments to the final reimbursement rate, adjustments to which all hospitals are entitled.
 
 
 48
 Few other courts have had the opportunity to consider the relationship between 42 U.S.C. § 1395ww(b)(4)(A) and the calculation of a hospital's base year cost under PPS. However, a majority of those that have agrees that Congress intended the section to function as a general mechanism for making the reimbursement system practical and equitable. For example, in Newport Hospital and Clinic, Inc. v. Sullivan, 1990 Medicare & Medicaid Guide (CCH) p 38,844, 1990 WL 179953 (D.D.C. Sept. 14, 1990), the Secretary agreed to adjust Newport's base year costs where Newport had started the relevant year in a small facility and later moved to a larger facility with more patients and staff. The Secretary refused, however, to apply the adjustment retroactively to the transition period. The court held that under 42 U.S.C. § 1395ww(b)(4)(A), the Secretary was required to make the adjustment apply retroactively. The court went on to note that even though Newport's situation did not fit neatly into the Secretary's regulations, the Secretary "was authorized and perhaps required" to grant the adjustments to Newport's base year costs pursuant to 42 U.S.C. § 1395ww(b)(4)(A). Id. at 24,063-64. Similarly, in The Methodist Hospital v. Sullivan, 1990 Medicare & Medicaid Guide (CCH) p 39,627, 1991 WL 263110 (D.D.C. Sept. 20, 1991), Methodist Hospital argued that the base year cost the Secretary calculated for it did not adequately reflect its actual operating costs due to certain capital improvement expenditures. The district court remanded the case to the Secretary with instructions that he adjust the base year cost in accordance with 42 U.S.C. § 1395(b)(4)(A). But see Sacred Heart Medical Center v. Sullivan, 958 F.2d 537, 549 (3rd Cir.1992) (finding that Congress did not intend that 42 U.S.C. § 1395ww(b)(4)(A) be incorporated into the PPS).[4]
 
 
 49
 Chandler's move from an old facility to a new facility created a distortion in its hospital costs. Chandler's unusual circumstances are precisely the "difficult to anticipate" sort that Congress could not provide for, and thus enacted 42 U.S.C. § 1395ww(b)(4)(A) to cover. By failing to take steps to calculate an appropriate, alternative base-year cost for Chandler, the Secretary has frustrated the Congressional intent embodied in that statute.
 
 CONCLUSION
 
 50
 We REVERSE the decision of the district court and REMAND this case to the Secretary of Health and Human Services. Although we uphold the Secretary's determination that Chandler Hospital is not a "new hospital" within the meaning of 42 C.F.R. § 412.74(a)(1), we find that Chandler is entitled to adjustments to its base year costs under 42 U.S.C. § 1395ww(b)(4)(A). We remand the case to the Secretary so that he may determine the extent of Chandler's entitlements under that statute. The Secretary is also directed to award Chandler interest as appropriate under 42 U.S.C.A. § 139500 (f)(2).
 
 
 
 [1]
 42 C.F.R. § 412.74(b) provides that:
 For purposes of computing transition payment rates for a new hospital, HCFA will not use the hospital specific portion of the prospective payment rate. Payments to new providers will be based solely on the Federal regional and national prospective payment rates, as described in § 412.70(d).
 
 
 [2]
 In fact, the sole reference to new hospitals is in the legislative history noted above. One statutory provision, 42 U.S.C. § 1395ww(b)(5), does provide that "In the case of any hospital having any cost reporting period of other than a 12-month period, the Secretary shall determine the 12-month period which shall be used for purposes of this section." Although new hospitals would fall under this provision, the provision affects other hospitals as well. See Sunshine Health, 809 F.2d 1390
 
 
 [3]
 In challenging the Secretary's interpretation of 42 C.F.R. § 412.74(a)(1), Chandler makes one final, unrelated argument: that because the decisions below are founded upon the faulty assumption that the PPS system generally will compensate for Chandler's "special circumstances," this court should overturn them. See Villa View Community Hospital, Inc. v. Heckler, 720 F.2d 1086, 1093-94 (9th Cir.1983) (reversing Secretary's decision to disallow reimbursement for land use costs where Secretary wrongly assumed that Medicare regulations prohibited the amortization of certain costs). This argument has little merit. First, neither the Secretary nor the district court made its belief that Chandler would be adequately compensated by other provisions of PPS a predicate for their decision that the Secretary's decision regarding 42 C.F.R. § 412.74(a)(1) was proper. In other words, those tribunals did not imply that Chandler was not a new hospital because other provisions of the PPS statute would compensate for its increased expenditures
 Second, Chandler's arguments are unpersuasive in and of themselves. Chandler argues that the court below erred because "Chandler's costs per patient ... far exceeded its PPS reimbursement per patient." However, the statement alone is meaningless: the PPS system was never designed to reimburse hospitals for their actual costs per patient. Moreover, what is at issue in this case is Chandler's reimbursement during the transition period, not its PPS reimbursement amounts generally.
 Similarly, Chandler states that the PRRB found that "CCH's costs were 'very unrepresentative' of Chandler's costs during the transition period." Again, this statement alone is meaningless. The relevant inquiry is whether Chandler's level of reimbursement during the transition period, after the Secretary had determined a proper base-year cost, was sufficiently related to Chandler's actual costs during that period. The fact that the initial 1982 base-year reflected inordinately low costs does not, by itself, indicate a problem with the level of reimbursement ultimately settled upon.
 
 
 [4]
 In Sacred Heart, the Secretary expressly took the position that Congress did not intend to incorporate 42 U.S.C. § 1395ww(b)(4)(A) into the PPS. Before us, by contrast, the debate has centered on whether or not Chandler is entitled to adjustment. At oral argument, for example, the Secretary acknowledged that regulations that clarify the procedure for requesting adjustment under 42 U.S.C. § 1395ww(b)(4)(A) have not yet been promulgated. The Secretary has not maintained that 42 U.S.C. § 1395ww(b)(4)(A) is simply not applicable
 In any event, we find that Congress did intend to incorporate § 1395ww(b)(4)(A). As we have noted before, "although the PPS is basically embodied within 42 U.S.C. § 1395ww(d) ... there is clear interface between § 1395ww subsections (b) and (d)." Sunshine Health, 809 F.2d at 1398. In Sunshine Health, we rejected the Secretary's argument that Congress did not intend to incorporate § 1395ww(b)(5). Id. The Secretary had conceded that PPS target amount calculations were based in part on § 1395ww(b)(3)(A). Thus, in light of the fact that § 1395ww(d) "by its own terms incorporates one of the main concepts of subsection (b)," we found it illogical to exclude from PPS other subsections of § 1395ww(b). Id. That reasoning applies with equal force here: it would be equally illogical to exclude § 1395ww(b)(4).